## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

TINA MILLER,                          :
                                      :
          Plaintiff,                  :
                                      :   Case No. 2:10-cv-123
          v.                          :
                                      :
MICHAEL J. ASTRUE,                    :
Commissioner of Social                :
Security,                             :
                                      :
          Defendant.                  :

### Memorandum Opinion and Order

In an action under 42 U.S.C. § 405(g), Plaintiff Tina
Miller seeks review of a March 26, 2010 final decision of the
Commissioner of Social Security (the "Commissioner") denying her
claims for benefits.  The Commissioner affirmed the decision of
Administrative Law Judge ("ALJ") Dory Sutker, who found
substance abuse was a contributing material factor to Miller's
disability, rendering her ineligible for benefits under 42
U.S.C. §§ 423(d)(2)(C); 1382c(a)(3)(J).[1]  Miller moved for the
Court to reverse and remand the decision, Pl.'s Mot. to Reverse
the Dec. of the Comm'r, Nov. 15, 2010, ECF No. 7, and the
Commissioner filed a cross motion to uphold it, Def.'s Mot. for

---

[1]     In 1996, Congress passed the Senior Citizens' Right to
Work Act, a component of the broader Contract with America
Advancement Act, to remove alcoholism or drug addiction as a
basis for obtaining Social Security benefits.  Pub. L. No. 104-
121, 110 Stat. 847.

Order Aff'g Dec. of the Comm'r, Feb. 18, 2011, ECF No. 11.  For
the reasons that follow, the Court **grants** the Commissioner's
motion and **denies** Miller's, affirming the agency action.

## I. Background

### A. Miller's Personal History

Miller, now thirty-seven years old, filed applications for
Social Security disability benefits and Supplemental Security
Income ("SSI") on January 16, 2007.  Admin. R. ("AR") at 125.
She claimed a disability onset date of January 1, 2001, AR 125,
alleging she cannot work because she suffers from debilitating
mental illness, including Post-Traumatic Stress Disorder
("PTSD"), anxiety disorder, agoraphobia and bipolar disorder.
AR 142-43.

The record describes the difficult, and at times horrific,
events Miller has been forced to endure in life.  She was born
in Keene, New Hampshire to alcoholic parents.  They divorced
when Miller was still a toddler, and Miller has long been
estranged from her father who is emotionally abusive.  When
Miller was six, her mother committed suicide.  After her
mother's death, she moved in with her grandmother, with whom she
lived until she was eleven years old.  While there, she was
physically abused by an uncle and by a neighbor.  Subsequently,
she moved between other relatives, foster care, and boarding

2

schools until reaching eighteen.  She dropped out of high school before graduating but later obtained a GED.  At twenty-three, she married and moved to Cape Coral, Florida where she began a family with her husband, a police officer.  After six years of marriage, however, she fled fearing for her life.  Her abusive husband, she claimed, went so far as to chain her in their basement, point a gun at her head, and shoot at her.  She since has had no contact with him or her three children, who remain with him.  She moved to Winchester, New Hampshire and then Brattleboro, Vermont, and currently resides in the Burlington, Vermont area.

Miller has long struggled with substance abuse.  She began drinking alcohol, sometimes to excess, at seventeen and started using cannabis at age twenty.  AR 308-09.  At twenty-seven, she stopped drinking heavily and turned to more potent drugs like cocaine and heroin.  AR 308-09.  She has been incarcerated in Vermont on several occasions.  Her longest stretch of jail time was from June 2003 until April 2004, when she was incarcerated at the Southeast State Correctional Facility in Windsor for selling heroin.  AR 285.  Miller testified before the ALJ that she has never held a job for more than seven months.  AR 31. Prior to her 2003 incarceration, she had worked as: an assembly line manufacturer, a bartender, a nurse's aide, a sales

3

associate, and a grocery store clerk.  AR 144.  She also has
worked briefly on several occasions as a housekeeper.  AR 31.
She spent the longest period as a nurse's aide, performing that
job periodically between 1994 and 2002.  AR 144.  After leaving
jail in 2004, she held a variety of customer service and sales
jobs for short periods, AR 139-40, and helped run a roofing
subcontracting business with a previous boyfriend, AR 396.

**B. Course of Treatment and Evaluations**

1. <u>2003-04 Incarceration and Immediate Aftermath</u>:

Since entering the Southeast State Correctional Facility in
2003, Miller has sought treatment for drug addiction and mental
illness from a variety of sources.  From September 2003 until
March 2004, she met with health care providers in jail.  AR 217-
78.  She complained of racing thoughts and inability to sleep,
and was placed on a regimen of Prozac and lithium.  AR 217-28,
253.  After her release in April, Miller returned to jail
briefly in August 2004 on a parole violation for a positive drug
test.  AR 311.

On August 27, 2004, after leaving the correctional
facility, Miller entered the Brattleboro, Vermont Retreat health
center.  AR 279.  Dr. Percy Ballantine, M.D., interviewed her
upon her arrival, and she was admitted for inpatient detox from
heroin and treatment of depression and anxiety.  AR 279.  Dr.
Ballantine noted that Miller had last used heroin, crack

4

cocaine, Adderall, and OxyContin days prior to her admission, and that she averaged five bags of heroin per day. AR 288. He diagnosed her with opioid dependence, major depression, PTSD, and panic disorder with agoraphobia. AR 280. She was prescribed Wellbutrin, Risperdal and Methadone, and was discharged on August 31, 2004. AR 279-80.

On September 3, 2004, Miller began counseling and treatment at the Rutland Mental Health Service in Rutland, Vermont. AR 305. Psychiatric Nurse Practitioner Anne Baylock met with Miller, noting that her longest period of total sobriety was seven months, four of which coincided with her recent incarceration. AR 309. Baylock's clinical assessment tracked Dr. Ballantine's, adding that she did not consider Miller bipolar. AR 312. Vera Houghtby, a clinical counselor at Rutland, commented on Miller's "history of relapse," believed due to Miller's "compliance without acceptance" with past treatment regimens. AR 314. Miller dropped out of treatment on October 28, 2004, with, according to Houghtby, "[n]one of her goals or objectives . . . achieved." AR 320. Shortly thereafter, it appears Miller was jailed again for approximately one month on a parole violation. AR 330-31.

2. Wallingford Recovery House – Joyce Anderson, CADC:

Correctional officials referred Miller to the Wallingford, Vermont Recovery House, where she successfully completed outpatient treatment from December 6-18, 2004.  AR 323-36. During that time, Miller was under house arrest.  AR 331. Certified Alcohol and Drug Counselor ("CADC") Joyce Anderson produced a Discharge Summary, in which she wrote that Miller "s[aw] herself as having no need for employment counseling," and also commented that "Miller has enough knowledge and resources to find employment on her own.  She just needs to stay out of jail to do it."  AR 330.

Miller admitted to last using heroin and cannabis in October 2004, but said that she had been clean since that time, including while in jail.  AR 330.  Anderson further wrote:

> Ms. Miller said she has been treated as a private
> patient or on an outpatient basis for psychological
> problems on three occasions. She was first treated for
> psychological or emotional problems when she was six
> years old. She reported having experienced the
> following psychological problems, unrelated to drugs
> or alcohol during the past 30 days:
>      serious depression
>      serious anxiety or tension
>      trouble understanding, concentrating or
>      remembering

AR 333.  Anderson's diagnostic impression of Miller was opiate dependence, which was then in the early stages of physiological remission, cannabis abuse, and alcohol abuse.  AR 335.  She

6

found Miller had a Global Assessment of Functioning ("GAF")
score of forty-eight when she first entered the clinic.  AR 336.[2]

After completing her work with the Recovery House, Miller
apparently returned to the Southeast State Correctional Facility
in February 2005, where she received further treatment.  AR 337-
41.

    3. Treatment in Burlington – Dr. Joseph Lasek, M.D. and
       Kerry Stout, LICSW:

Miller moved to the Burlington, Vermont area.  By December
2005, she was working with health care providers at the Howard
Center for Human Services in Burlington.  AR 496.  She continued
meeting with Howard staff until at least November 2008.  AR 598.
Throughout her time at Howard, Miller relapsed frequently,
admitting to using or testing positively for drugs like heroin,
cocaine, ecstasy, and marijuana, interspersed with clean tests
or admissions of sobriety.  AR 420-507.

---

[2]    The GAF Scale measures "the clinician's judgment of
the individual's overall level of functioning," and is used to
provide a single metric with which to judge a patient's progress
over time.  Am. Psychiatric Ass'n, Diagnostic and Statistical
Manual of Mental Disorders ("DSM-IV") 30 (4th ed. 1994).  It is
a 0-100 scale, with 100 standing for "[s]uperior functioning."
*Id.* at 32.  A score of 41-50 indicates "[s]erious symptoms
(e.g., suicidal ideation, severe obsessional rituals . . .) OR
any serious impairment in social, occupational, or school
functioning (e.g. no friends, unable to keep a job)."  *Id.* at
32.

On July 20, 2007, Dr. Joseph Lasek, a psychiatrist at the Howard Center, met with Miller and produced an initial diagnostic report.  AR 447.  Miller endorsed suffering symptoms of panic attacks one to four times per day, with recurring fears of having such attacks.  AR 447-48.  He found that she endorsed symptoms of obsessive compulsive disorder ("OCD"), particularly in her constant focus on hygiene and cleanliness.  AR 448.  She endorsed almost every symptom of PTSD, including dissociation, blackouts, and intrusive nightmares and flashbacks related to the trauma.  AR 448.  She reported her biggest difficulty with substance abuse began around the time she left her husband.  AR 449.  He noted that she was, at the time of the interview, smoking three to four bowls of marijuana per day to cope with her "anxiety and insomnia."  AR 449.  He found she presented "an extremely complicated constellation of psychiatric symptoms," meeting the criteria for PTSD, bipolar disorder, anxiety disorder, panic disorder with agoraphobia, OCD, and opiate, cannabis and cocaine dependence.  AR 450.  He further assigned her a GAF of forty,[3] and prescribed lithium.  AR 450.

---

[3]     A score of 31-40 denotes:

Some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment,

In follow-up reports, Dr. Lasek noted Miller's difficulties in following her treatment regime.  He also determined that what he had originally diagnosed as bipolar disorder was instead likely a comorbid interaction between Attention Deficit Hyperactivity Disorder ("ADHD") and PTSD.  He wrote that "[d]espite all these problems, she has maintained her sobriety since stopping methadone last February [2007]."  AR 511.  That statement, however, is contradicted by the relapses for cocaine, heroin and ecstasy during that time, AR 461-92, and Lasek's own report of July 20, 2007, which noted Miller's marijuana use, AR 449.  Furthermore, in his October 6, 2008 report, he wrote that Miller "is using marijuana to help with her sleep and we talked about how this can worsen her anxiety and sleep in the long run."  AR 519.  Dr. Lasek's last filing is on April 20, 2009, in which he notes that he had not seen Miller since November and believed she was not taking her medication.  AR 598.

On November 25, 2008, Kerry Stout, LICSW at the Howard Center, wrote a letter on behalf of Miller's applications for benefits.  AR 597.  She had met with Miller twice weekly for four weeks, and once a week thereafter.  AR 597.  She opined

_____

thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work . . .).

DSM IV, at 32.

that Miller's "current symptoms are resulting from traumatic events which predate her substance use and are appropriately reemerging now that she is substance free." AR 597. She further expressed that "[i]t is very common for someone who has experienced extreme abuse and violence to resort to substances to alleviate acute PTSD symptoms." AR 597. She concluded that Miller's symptoms prevent her from working and that the prognosis for Miller "is guarded." AR 597. Several weeks later, in a December 15, 2008 meeting with Stout, Miller confessed she felt "out of control that she had not told the whole truth to [Stout]." AR 604.

Miller's last record of treatment is July 2009, when she sought the care of the Community Health Center of Burlington. AR 606-09. Providers there noted her status was "worsening" since she was homeless and was suffering from the "symptoms of a major depressive episode." AR 606-09.

4. Evaluations by Government Consultants:

To provide a Mental Residual Functional Capacity Assessment to the Social Security Administration, Drs. William Farrell, Ph.D and Irvin Cohen, M.D. (together, the "Government Consultants"), reviewed Miller's medical files without examining her personally. AR 575-95. Dr. Farrell completed his portion of the review on May 30, 2007. AR 577. He diagnosed her with

opioid dependence, major depression, PTSD and panic disorder
with agoraphobia.  AR 577.  He noted that while Miller had a
"long [history] of opioid dependence," she was "better with
business & relationships when abstinent."  AR 577.  He observed
that her focus deteriorated at those times when she abused
drugs.  AR 577.  When abstinent, however, he found she was able
to overcome her mental illnesses to attend appointments, care
for herself, engage pleasantly with others, and pay bills.  AR
577.  With abstinence, she would have "sufficient concentration
persistence and pace to sustain for two-hour blocks of time thru
the workday and workweek in low stress work activities."  AR
577.  Dr. Cohen filed a consulting report on July 21, 2008,
concluding also that, when sober, Miller's illnesses do not rise
to the level of disabilities.  AR 593.

   **C. ALJ Decision**

   The ALJ applied the traditional five-step disability
determination analysis, required under 20 C.F.R. §§ 404.1520 and
416.920, to gauge whether Miller would be disabled without
discounting the impacts of her substance abuse.  AR 8-11.
Finding, at step one, Miller had not engaged in substantial
gainful activity since her alleged disability onset date, the
ALJ moved to steps two and three.  AR 10.  The ALJ concluded
that Miller suffered from severe medically determinable

impairments—anxiety disorder, affective disorder, and drug and alcohol abuse—that met the listing criteria for disabilities in appendix 1 of 20 C.F.R. Part 404, Subpart P.  AR 10-12.  Making the determination at step three that Miller was presumptively disabled, AR 12, the ALJ did not need to consider steps four and five before turning to the issue of Miller's substance abuse. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Since there was medical evidence of Miller's substance abuse, the ALJ was required to determine whether "drug addiction or alcoholism [was] a contributing factor material to the determination of disability."  20 C.F.R. §§ 404.1535(a), 416.935(a); *see* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J).  The "key factor" in making that decision is "whether [the ALJ] would still find [the claimant] disabled if [she] stopped using drugs or alcohol."  20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).

In evaluating Miller's medical evidence, the ALJ placed "significant weight" on the opinion of Dr. Cohen that Miller's "primary problem was opioid dependence," finding it was consistent with the rest of the record.  AR 12.  Although the ALJ did not mention Dr. Lasek by name or allocate a specific weight to his reports, she did mention his finding of a GAF score of forty, his observation that Miller had not followed her lithium treatment protocol, and his note that she was still

12

smoking marijuana.  AR 11.  The ALJ also discussed Miller's
documented relapses with other drugs throughout her treatment
history.  AR 11.  The ALJ found that Miller would continue to be
severely impaired in performing work activities if Miller
stopped abusing drugs, but determined those restrictions would
not rise to the level required to meet the listing requirements
for disabilities.  AR 12.

Finally, the ALJ entered into a Residual Functional
Capacity ("RFC") analysis to determine which jobs Miller might
be able to perform.  The ALJ found Miller was not credible in
contending that she could not work.  AR 14.  The ALJ highlighted
that Miller had often chosen jobs that required interpersonal
contact and had maintained long-term relationships with
boyfriends in the recent past, undermining her claims of
crippling social anxiety.  AR 14.  The ALJ also noted that while
Miller attributed her employment struggles to her mental
illness, the record indicated her repeated failures to follow
through on her health care providers' treatment recommendations.
AR 14.  The ALJ found the letter submitted by Kerry Stout,
LICSW, was not entitled to significant weight.  AR 14.  The ALJ
found Stout's opinion that Miller could not work "[in]consistent
with the objective findings of noncompliance with treatment, low
credibility and intermittently continuing substance abuse."  AR

13

14.  The ALJ found that Miller, if substance-free, would have
the RFC to perform work "limited to simple repetitive and
routine tasks in an environment free of fast paced production
requirements and involving only simple work related decisions
and few, if any, work place changes," with only brief
interpersonal contact.  AR 13.  The ALJ concluded that, given
Miller's RFC, she could perform her past work as a cleaner and
therefore was not disabled.  AR 15.

## II.  Discussion

The Commissioner, in adopting the ALJ's decision and in the
present action for review, has not challenged the ALJ's initial
finding that Miller would be disabled if the impacts of her
substance abuse were considered alongside her other symptoms.
AR 1; Def.'s Mot.  The only disputed question before the Court
is whether substance abuse is a contributing material factor to
Miller's disability.  As such, the issue is not whether Miller
would continue to experience severe impairments if sober—the ALJ
found that she would, AR 12.  Rather, it is whether those
continuing impairments would remain at the level of the criteria
in appendix 1 of 20 C.F.R. Part 404, Subpart P, or if not, she
would have the RFC to return to work as a housekeeper.

As grounds for reversing the materiality decision, Miller
argues that the ALJ failed to adequately consider the opinions

14

of Dr. Lasek, Kerry Stout, and Joyce Anderson, each of whom delivered clinical evaluations of Miller's impairments during periods when she alleged she was sober.  Since they each found Miller continued to suffer from substantial symptoms of mental illness when not using drugs, Miller argues, their evaluations indicate that her disability would remain independent of her substance addictions.

The Court may only review the agency decision for legal errors or factual findings that are not supported by substantial evidence.  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)).  A factual finding has the support of substantial evidence if it is based on "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Shaw*, 221 F.3d at 131 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal citations and quotations omitted).

**A. Dr. Lasek, M.D.**

ALJs typically must give "more weight to the opinion of a source who has examined" the claimant than to one who has not. 20 C.F.R. §§ 404.1527(d), 416.927(d).  *See Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("[t]he law gives special evidentiary weight to the opinion of the treating physician.").  If the ALJ finds the treating source's opinion on

15

the claimant's condition "is well supported by medical findings and [is] not inconsistent with other substantial record evidence," the ALJ must give it controlling weight. *Shaw*, 221 F.3d at 134; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Otherwise, the ALJ must determine, in a multi-factor analysis, what level of lesser authority to accord the opinion. *Clark*, 143 F.3d at 118; 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). No matter the weight the ALJ assigns, the judge must "always give good reasons in [the] notice of determination or decision for the weight . . . [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

The Commissioner does not dispute that Dr. Lasek was a treating source. In fact, Lasek met regularly with Miller from July 2007 until November 2008. AR 447, 598. While the ALJ made passing reference to the treating source rule, she did not mention Dr. Lasek by name or assign a weight to his reports. AR 11, 13. The analysis the ALJ did conduct—considering Lasek's GAF finding, his note that Miller was failing to adhere to her lithium protocol, and his observation that she was continuing to use marijuana, AR 11—was insufficient to meet either the formal requirements of the rule or its general substance. *See Halloran v. Barnhart*, 362 F.3d 28 (2d Cir. 2004). It did not give

16

reasons, let alone "good reasons," as to how Lasek's findings should be viewed.

That oversight "ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).  A remand is unnecessary, however, when applying the rule correctly "could lead to only one conclusion." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).  This may be so when the evidence in question is not "significantly more favorable to the claimant than the evidence considered." *Zabala*, 595 F.3d at 409.  This is such a case in which a remand is unwarranted.  Miller contends that the ALJ's mistake was significant because Dr. Lasek's reports revealed she continued to suffer greatly at a time when she was "presumably abstinent."  Pl.'s Mot. 5.  Any such presumption is plainly contradicted by the record, however, which shows that Miller relapsed on many occasions while meeting with Lasek.  AR 420-507.  Dr. Lasek himself noted that Miller was continuing to use marijuana.  AR 449, 519.

Separately, Miller does not show how Dr. Lasek's findings conflict with the record evidence on which the ALJ did clearly rely in determining that Miller would retain the RFC to work as a housekeeper if sober, such as the Government Consultants' reports.  While Dr. Lasek diagnosed Miller with mental

17

illnesses, he never addressed her capacity to work in spite of
those impairments.  Of course, it would be a different matter if
Miller were to file a claim for benefits with findings from a
treating source demonstrating an inability to work springing
from symptoms not materially related to her substance abuse.  In
the case at bar, however, Dr. Lasek's report addresses neither
of the issues at stake: the extent to which Miller's overall
disability is connected to her substance abuse or her ability to
work when abstinent.

   **B. Kerry Stout, LICSW**

   A second issue is whether the ALJ gave the letter submitted
by Kerry Stout, LICSW its due consideration.  A licensed
clinical social worker is not considered an "acceptable medical
source" who can render a medical opinion or establish that a
claimant has a "medically determinable impairment[ ]."  20
C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (defining "medical
opinions"); 20 C.F.R. §§ 404.1513 (a),(d), 416.913(a),(d)
(defining and distinguishing "acceptable medical sources," who
may provide evidence to establish the existence of impairments,
and "other sources," who cannot).

   Still, the ALJ "may also use evidence from other sources to
show the severity of [the] impairment[] and how it affects [the
claimant's] ability to work."  20 CFR §§ 404.1513(d),

416.913(d).  Social Security Ruling ("SSR") 06-03p provides that
licensed clinical social workers are health care providers who,
though "other sources," can still offer "important" opinions
that "should be evaluated on key issues such as impairment
severity and functional effects, along with the other relevant
evidence in the file."  Titles II and XVI: Considering Opinions
and Other Evidence From Sources Who Are Not "Acceptable Medical
Sources" in Disability Claims; Considering Decisions on
Disability by Other Governmental and Nongovernmental Agencies
("SSR 06-03p"), 71 Fed. Reg. 45,593, 45,595 (Aug. 9, 2006),
*accord Swanson v. Astrue*, No. 2:10-cv-217, 2011 WL 2582617, at
*7 (D. Vt. June 29, 2011) (Conroy, Magistrate J.); *Canales v.
Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010);
cf. *Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008).

    SSR 06-03p encourages ALJs to apply the same factors used
in weighing the opinions of "acceptable medical sources" in
assessing how much to rely on the conclusions of "other
sources."[4]  71 Fed. Reg. at 45,595; *Swanson*, 2011 WL 2582617, at
*7.  However, it provides a broader standard for the depth of

---

    [4]    Those factors are: the character of the treatment
relationship, the quality of the evidence underlying the
opinion, the opinion's consistency with the record, the source's
clinical specialty, as well as any other relevant factors
presented to the ALJ.  20 C.F.R. §§ 404.1527(d)(2)-(6),
416.927(d)(2)-(6).

treatment ALJs must give to such sources in written decisions.
71 Fed. Reg. at 45,596.  It notes simply that "the adjudicator
generally should explain the weight given to opinions from these
'other sources,' or otherwise ensure that the discussion of the
evidence . . . allows a claimant or subsequent reviewer to
follow the adjudicator's reasoning, when such opinions may have
an effect on the outcome of the case."  *Id.*

Here, the ALJ made mention of SSR 06-03p, AR 13, and
proceeded to comply with its requirements as to Stout's opinion.
The decision expressly weighs the letter's findings, noting the
conclusion that Miller could not work was not entitled to
significant credence.  AR 14.  The ALJ provided further
explanation, asserting that Stout's "assessment [was] not
consistent with the objective findings of noncompliance with
treatment, low credibility and intermittently continuing
substance abuse."  AR 14.  That discussion, while not detailed,
is sufficient to put this Court and Miller on notice as to the
ALJ's basis for discounting Stout's opinion, coming as it did
just after the ALJ examined Miller's lack of credibility,
history of relapses, and inconsistent compliance with her
treatment protocols, AR 14.

In addition, it is supported by substantial evidence.
Unlike Lasek, Stout reached the question of Miller's fitness for

work and found that she could not hold a job.  But her assessment was not echoed by any other medical professionals in the record, and is directly contradicted by Dr. Cohen's opinion, which the ALJ credited highly.  It is further undermined by the assessment of Joyce Anderson, CADC, at the Wallingford Recovery House, who determined: "Miller has enough knowledge and resources to find employment on her own.  She just needs to stay out of jail to do it."  AR 330.  That finding came during another allegedly sober period for Miller.  AR 330.

Moreover, the record contradicts Stout's contention that Miller was abstinent at the time of the letter.  As the Commissioner notes in his motion, Stout should have been on alert to Miller's relapses when she wrote it, given the frequent positive drug tests the Howard Center recorded in her file, AR 420-507, and because Dr. Lasek had copied Stout on the October 6, 2008 report in which he wrote that Miller "is using marijuana to help with her sleep and we talked about how this can worsen her anxiety and sleep in the long run," AR 519.  Def.'s Mot. 16-17.  Those facts cast significant doubt on the usefulness of Stout's report for the purposes of determining materiality.  The ALJ did not commit legal error in weighing Stout's conclusions, and its decision to accord them limited weight had a basis in substantial evidence.

### C. Joyce Anderson, CADC

Miller's second line of attack concerns Joyce Anderson's report.  Miller points out that the ALJ failed to discuss it, *see* AR 11-15.  Anderson met with Miller from December 6-18, 2004, and Miller claimed, in those interviews, that she had been substance-free since October 2004.  AR 330.  The Commissioner is in fact required to consider all of the relevant evidence received in making a disability determination.  20 C.F.R. §§ 404.1527(b)-(c), 416.927(b)-(c); SSR 06-03p, 71 Fed. Reg. at 45,595.  The ALJ is obliged to consider and give reasons for rejecting the reports of "other sources," regardless of whether they are medical professionals.  SSR 06-03p, 71 Fed. Reg. at 45,596.

While that was not done here, it did not amount to an error worthy of remand, since even "application of the correct legal principles to the record could lead to only one conclusion." *Johnson*, 817 F.2d at 986.  Simply put, Anderson's findings do not argue against the materiality determination.  To the contrary, Anderson found that even though Miller continued to suffer from depression, anxiety, poor memory and concentration, and had a GAF of forty-eight, she "ha[d] enough knowledge and resources to find employment on her own" if she were to stay out of jail.  AR 330.  Miller, according to Anderson, "s[aw] herself

22

as having no need for employment counseling." AR 330.  Those observations, especially if Miller were truly abstinent at the time, only enhance the ALJ's conclusions.  The failure to consider them is not reversible error.

In view of the foregoing analysis, the Court grants the Commissioner's motion, affirms the agency decision, and denies Miller's motion to reverse and remand.

Dated at Burlington, in the District of Vermont, this 8th day of December, 2011.

/s/William K. Sessions III_____
William K. Sessions III
U.S. District Court Judge